IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| DAVID FIELDS, | ) |
|---|---|
| Plaintiff, | ) |
| v. | ) 2:14cv1311 |
| | ) **Electronic Filing** |
| CITY OF PITTSBURGH, ET AL., | ) |
| Defendants. | ) |

**MEMORANDUM OPINION**

December 16, 2016

**I.    INTRODUCTION**

This civil rights action was filed by plaintiff David Fields ("Fields") against the City of Pittsburgh, Pennsylvania ("City") and several of its police officers, Christopher Goetz ("Goetz"), Jeffrey Labella ("Labella"), Richard Reilly ("Reilly"), and "John Doe." In the amended complaint (ECF No. 34), Fields asserts claims under 42 U.S.C. § 1983 against the defendants for violations of his First and Fourth Amendments rights, along with a *Monell* claim against the City, arising out of an encounter with the officers that took place on July 8, 2013.[1] Fields also asserts claims for intentional infliction of emotional distress ("IIED") and assault and battery against the individual defendants under Pennsylvania law.

Presently pending before the Court is defendants' motion for summary judgment (ECF No. 69), in which defendants request the entry of summary judgment as to all of Fields' claims. For the reasons set forth below, defendants' motion will be granted.

---

[1] Plaintiff has agreed to withdraw all claims against Reilly and "John Doe." Pl.'s Br. at 17 n.6. He has also agreed to withdraw his First Amendment claim and all claims against the City of Pittsburgh. Pl.'s Br. at 15, 17. Therefore, judgment will be entered in favor of defendants and against Fields as to these parties and claims.

1

## II. BACKGROUND

### A. Facts

Fields owns a car dealership, B Fields Motors, Inc., located at 2340 Fifth Avenue in Pittsburgh. Defs.' Concise Statement of Material Facts ("CSMF") ¶ 1. The dealership is next to a daycare center owned by Fields' wife, Kimberly. *Id.* The dealership and daycare center are on the south side of Fifth Avenue, with a restricted bus lane running eastbound directly in front of Fields' property and two lanes of unrestricted traffic running westbound. *Id.* ¶ 3.

Beginning in 2009, the City received complaints through its 311 Center about vehicles parked on the sidewalk in front of the dealership forcing pedestrians and cyclists into the bus lane. Defs. CSMF ¶ 4. After receiving the initial complaints in March 2009, the City installed "No Parking" signs in front of the property, which were removed (it is unknown who removed them) and then reinstalled by the City on a few occasions. Pl.'s Dep. at 43:7-15. Additional complaints were received in August 2010, April 2011, May 2011, and June 2013. Defs. Ex. J. Fields and his wife acknowledged that they were told "a couple of times" that they could not park cars on the sidewalk. Kimberly Fields Dep. at 14:16-18. Fields testified, however, that after speaking with officials from the City, he was told "that it was okay to juggle cars" – by which he meant temporarily park a car on the sidewalk while moving cars in and out of his lot. Pl.'s Dep. at 16:19.

On the morning of July 8, 2013, Lieutenant Reilly was instructed to go to B Fields Motor to look into a complaint about cars parking on the sidewalk. Defs.' CSMF ¶ 5. No one was at the dealership when he arrived, so he decided to do other work and go back later in the day. *Id.*

Sometime later that same day, Plaintiff called 911 regarding a vehicle that was parked in the loading zone for the daycare center, which is across Fifth Avenue from Fields' property. *Id.* ¶

2. Officer Connelly of the Pittsburgh Police Department responded to the call and spoke with Plaintiff's wife about the vehicle. Pl.'s CSMF ¶ 42. At the time, Fields' van was parked on the sidewalk in front of the dealership to unload supplies for the daycare. Defs.' CSMF ¶ 2; Pl.'s CSMF ¶ 42. After discussing the vehicle parked in the loading zone with Fields' wife, Officer Connelly asked about the van parked on the sidewalk, and Fields' wife explained that it was parked there to unload supplies. According to Fields' wife, Officer Connelly told her, "okay, that's no problem . . . . just make it quick." Kimberly Fields Dep. at 21:2-3.

In the meantime, Labella and Goetz arrived on the scene in their police cruiser,[2] and Labella pulled down the window to talk to Connelly. According to Fields' wife, Connelly told Labella and Goetz that "everything is ok. [It was] just a call about this car [that was parked in the loading zone] . . . . it's already taken care of, it's okay." *Id.* at 21:22-25. Nevertheless, Labella pulled into the lot of the dealership and honked his horn. Defs.' CSMF ¶ 7. According to Fields, Labella waved for him to come outside. Pl.'s Dep. at 158:18-21. Fields testified that, once he was outside, Labella told him to "[m]ove that van off the sidewalk." *Id.* at 158:25 – 159:1. During the ensuing exchange between Fields and Labella, Fields claims that he told Labella that he would move the van, but that he could not do so until the police cruiser was moved from the entrance to the lot. *Id.* at 158:5-8. Labella allegedly responded, "you don't tell me what to do." *Id.* at 159:11-12. After Fields repeated that he could not move the van until the cruiser was moved, Labella allegedly said, "oh, you're an asshole, huh? We'll just F'ing tow it." *Id.* at 159:15-16. According to Labella, however, it was Fields who said "get the fuck off my property, I want you people off my property." Labella Dep. at 21:16-18.

---

[2] It is not clear from the record whether Labella and Goetz "responded as back up" after being dispatched to the call, as defendants claim, or voluntarily responded to the call. In any event, this fact is not material.

Following that exchange, Labella pulled the cruiser out of the lot and parked a few feet behind the van to write a ticket or prepare to tow the van. *Id.* ¶ 8. According to Mrs. Fields, at that time, her husband "started . . . walking towards the end of [the] fence [around his lot towards where the van was parked] . . . And the officers had got out, and they were saying . . . we're towing this van, you know, this van is out of here." Kimberly Fields Dep. at 26:3-8.

At that point, Fields got out his cell phone and began recording.[3] The video depicts Labella walking from just behind where the van is parked to his cruiser, opening the door, reaching inside, closing the door, and then walking toward Fields, who is standing adjacent to the van. Video 346.mov, time 0:00 – 0:16. Mrs. Fields can be heard telling Labella that the other officer, Connelly, is dealing with the car parked in the loading zone and that the van is not to be towed. When Labella appears to be directly in front of Fields, Labella can be heard saying "you better get out of my face." The video then cuts off. According to Fields, the video ended because Labella slapped him in the face and knocked his phone to the ground. Fields testified that Labella then grabbed him by the collar. Pl.'s Dep. at 166:4-5. This portion of the encounter did not last long. As Fields testified, Labella "didn't grab me and, like, just keep holding me . . . . It was a slap, grab up, and then he let me go." Pl.'s Dep. at 215:8 – 10. For his part, Labella does not admit that he slapped Fields. According to his testimony, "[a]t some point after the video ended [he] decided that because [Fields] was bumping [him] and stepping on [his] feet and invading [his] personal space to the point where [Fields] was in [his] red zone and [he] felt threated by [him], [he] reached up and grabbed his [phone] . . . and set it on the hood of Lieutenant Reilly's vehicle[.]" Labella Dep. at 80:8-16.

---

[3] Fields and his wife testified that that they had complained to the police about harassment by officers regarding cars parked illegally on the sidewalk, and they had been instructed to record all incidents from then on that they believed were harassing. Pl.'s CSMF ¶¶ 54-55.

A second video recorded by Fields' son picks up the scene a few minutes later, after Lieutenant Reilly arrived. At the start of the video, Fields can be seen picking up his cell phone off the hood of Reilly's vehicle. Video 348.mov, time 0:02 – 0:05. Fields can then be seen and heard talking with Reilly, who is seated inside his vehicle, and accusing Labella of assaulting him, as Labella, Goetz, and another officer stand nearby. Video 348.mov, time 0:05 – 0:25. Approximately 18 seconds into the video, Reilly exits his vehicle, as Plaintiff continues to attempt to explain what had happened. Video 348.mov, time 0:18 – 0:20. At that point, Fields, Labella, Reilly, and the third officer are standing in close proximity outside the driver's side door of Reilly's vehicle. Fields then turns towards Labella and make two quick moves – which defendants have characterized as "lunges" – in Labella's direction. His right hand is clenched in a fist at his side. At that moment, the three officers converge on Fields and attempt to place him in handcuffs. Video 348.mov, time 0:25 – 0:30. Fields resists, placing his hands out in front of him. Video 348.mov, time 0:30 – 0:33. It is not clear from the video what transpires next. Video 348.mov, time 0:33 – 0:50. At some point, however, Labella deployed his Taser, and Fields was subdued, placed in handcuffs, and directed by, with his hands behind his back by two officers – one of whom has his baton pressed to Fields' chest and the other of whom is walking behind Fields – to a police cruiser. Defs.' CSMF ¶ 15; Video 348.mov, time 1:16 – 1:50. He was eventually transported to the hospital and held overnight for observation after a heart malfunction was detected. *Id.* ¶ 19. On September 23, 2013, Fields pleaded guilty to two counts of harassment and one count of disorderly conduct arising out of the incident. *Id.* ¶ 20.

B.  **Procedural History**

Fields initiated this action by filing a complaint against Goetz, Labella, and the City on September 24, 2014. (ECF No. 1). Defendants responded by filing a partial motion to dismiss on

5

November 24, 2014. (ECF No. 12). On March 2, 2015, Fields filed a motion to amend his complaint to clarify his Fourth Amendment claim, add a claim of First Amendment retaliation, which was related to a separate incident some months later, and name additional defendants. (ECF No. 29). The Court granted Fields' motion on April 7, 2015. (ECF No. 33). After the filing of the amended complaint, the defendants filed a second partial motion to dismiss, seeking to dismiss the false arrest, conspiracy, retaliation, and IIED claims. (ECF Nos. 35, 40). On December 1, 2015, the Court denied the partial motions to dismiss "without prejudice to raise the issues at the summary judgment stage." (ECF No. 60). The instant motion followed after the close of discovery.

### III. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate only where there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Melrose, Inc. v. Pittsburgh*, 613 F.3d 380, 387 (3d Cir. 2010). Issues of fact are genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also McGreevy v. Stroup*, 413 F.3d 359, 363 (3d Cir. 2005). Material facts are those that will affect the outcome of the trial under governing law. *Anderson*, 477 U.S. at 248. In ruling on a motion for summary judgment, the Court's role is "not to weigh the evidence or to determine the truth of the matter, but only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the nonmoving party." *American Eagle Outfitters v. Lyle & Scott Ltd.*, 584 F.3d 575, 581 (3d Cir. 2009). "In making this determination, 'a court must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor.'" *Farrell v.*

6

*Planters Lifesavers Co.*, 206 F.3d 271, 278 (3d Cir. 2000) (quoting *Armbruster v. Unisys Corp.*, 32 F.3d 768, 777 (3d Cir. 1994)).

The moving party bears the initial responsibility of stating the basis for its motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party meets this burden, the party opposing summary judgment "may not rest upon the mere allegation or denials," but "must set forth specific facts showing that there is a genuine issue for trial." *Saldana v. Kmart Corp.*, 260 F.3d 288, 232 (3d Cir. 2001) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 n.11 (1986)). "For an issue to be genuine, the nonmovant needs to supply more than a scintilla of evidence in support of its position – there must be sufficient evidence (not mere allegations) for a reasonable jury to find for the nonmovant." *Coolspring Stone Supply, Inc. v. American States Life Ins. Co.*, 10 F.3d 144, 148 (3d Cir. 1993).

## IV. DISCUSSION

### A. Section 1983 Claims

#### 1. False Arrest

In Count I, Fields asserts a claim for false arrest against all defendants. In moving for summary judgment, defendants argue that this claim is barred by *Heck v. Humphrey*, 512 U.S. 477 (1994), because Fields pleaded guilty to the charges against him and his convictions have not been reversed or otherwise declared invalid.[4] Alternatively, Defendants contend that Fields'

---

[4] As an initial matter, Fields argues that the Court already ruled on the issue of whether *Heck* bars his claim when it denied defendants' motion to dismiss. He contends, in turn, that defendants have not advanced any "reason why the Court should reverse its earlier ruling." Pl.'s

claim fails because probable cause existed to arrest him.

In *Heck*, the United States Supreme Court held that:

> [I]n order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of *habeas corpus* . . . . A claim for damages bearing that relationship to a conviction or sentence that has *not* been so invalidated is not cognizable under § 1983. Thus, when a state prisoner seeks damages in a § 1983 suit, the district court must consider whether a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence; if it would, the complaint must be dismissed unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated. But if the district court determines that the plaintiff's action, even if successful, will *not* demonstrate the invalidity of any outstanding criminal judgment against the plaintiff, the action should be allowed to proceed, in the absence of some other bar to the suit.

512 U.S. at 486–87. While *Heck*, itself, involved a malicious prosecution claim, courts have held that *Heck* "may also serve as a bar to § 1983 false arrest and false imprisonment claims when the plaintiff has been convicted." *Curry v. Yachera*, No. CIV.A. 14-5253, 2015 WL 1186014, at *6 n.15 (E.D. Pa. Mar. 13, 2015) (collecting cases). At the same time, it is well settled that "'a claim of unlawful arrest, standing alone, does not necessarily implicate the validity of a criminal prosecution following the arrest.'" *Bresko v. John*, 31 F. App'x 56, 60 (3d Cir. 2002) (quoting *Montgomery v. De Simone*, 159 F.3d 120, 126 n.5 (3d Cir. 1998) (quotation and citation omitted)). Instead, "[a] district court must make a fact-based inquiry to determine whether a successful § 1983 action would undermine the validity of a conviction or sentence." *Leith v. Middlesex & Somerset Cnty. Prosecutor's*, No. CV 15-7227 (FLW), 2016 WL 3647995, at *6 n.7 (D.N.J. July 8, 2016) (citing *Gibson v. Superintendent*, 411 F.3d 427, 451 (3d Cir. 2005)).

---

Br. at 4. However, as defendants observe, the Court did not rule on this issue earlier; rather, the Court denied the partial motions to dismiss "*without prejudice* to raise the issues at the summary judgment stage." (ECF No. 60) (emphasis added).

As the example of a type of "§ 1983 action that does not seek damages directly attributable to conviction or confinement but whose successful prosecution would necessarily imply that the plaintiff's criminal conviction was wrongful[,]" the *Heck* Court offered the following:

> A state defendant is convicted of and sentenced for the crime of resisting arrest, defined as intentionally preventing a peace officer from effecting a lawful arrest. . . . He then brings a § 1983 action against the arresting officer, seeking damages for violation of his Fourth Amendment right to be free from unreasonable seizures. In order to prevail in this § 1983 action, he would have to negate an element of the offense of which he has been convicted. Regardless of the state law concerning res judicata . . . , the § 1983 action will not lie.

*Heck*, 512 U.S. at 486 n.6.

Here, Plaintiff was initially charged with two counts of aggravated assault, obstruction of the administration of law, and resisting arrest. Eventually, although the initial charges were withdrawn, Plaintiff pleaded guilty to two counts of harassment and one count of disorderly conduct. There is no evidence that these convictions were reversed on appeal or otherwise invalidated. Thus, the Court agrees with defendants that the false arrest claim is barred by *Heck*. A finding that Fields was arrested without probable cause would "necessarily imply" that he was not engaging in the conduct to which he pleaded guilty and thus undermine the validity of his convictions.[5] *See, e.g.*, *Rucker v. City of Pittsburgh*, No. CIV.A. 08-1213, 2010 WL 3892148, at *8 (W.D. Pa. Aug. 30, 2010) (finding that the plaintiff's claim was barred by *Heck* "because [his] guilty plea to disorderly conduct would be undermined by his claim for false arrest and imprisonment"); *Burke v. Twp. of Cheltenham*, 742 F. Supp. 2d 660, 669 (E.D. Pa. 2010)

---

[5] Some have questioned whether *Heck* applies in cases where, as here, a civil rights plaintiff is not in custody and thus has "no recourse under the habeas statute." *Gilles v. Davis*, 427 F.3d 197, 210 (3d Cir. 2005) (citing *Spencer v. Kemna*, 210 523 U.S. 1, 19-20 (Souter, J., concurring); *id.* at 21 (Ginsburg, J., concurring); *id.* at 25 n.8 (Stevens, J., dissenting)). But the Third Circuit Court of Appeals has determined that *Heck* still applies in these circumstances. *See id.*; *Williams v. Consovoy*, 453 F.3d 173, 177 (3d Cir. 2006).

(holding that *Heck* barred the plaintiff's claim because "it is not possible for [him] to argue that the arresting officers lacked probable cause to arrest and detain him without also arguing that his later conviction for disorderly conduct was invalid"); *Hayhurst v. Upper Makefield Twp.*, No. CIV.A. 06-3114, 2007 WL 1795682, at *8 (E.D. Pa. June 20, 2007) (holding that *Heck* barred the plaintiff's false arrest claim where "[t]he same disputed facts that [she] contends were insufficient to establish probable cause for her arrest . . . [were] the same facts that formed the basis for her disorderly conduct conviction"); *Deitrick v. Costa*, No. 4:06-CV-1556, 2014 WL 268681, at *12 (M.D. Pa. Jan. 23, 2014) (holding that the plaintiff's claim was "*Heck*-barred because the state court records clearly show that [the plaintiff] pleaded guilty to the charges of harassment and disorderly conduct, and there is no indication that it has been reversed, expunged, or otherwise invalidated").

Fields' arguments do not convince the Court otherwise. He seems to think that because he pleaded guilty to a "significantly less serious charge," *Heck* does not apply. This is misguided, though. As the Court of Appeals has recognized, "a guilty plea – even one for a lesser offense – does not permit a later assertion of no probable cause." *See Walker v. Clearfield Cnty. Dist. Attorney*, 413 F. App'x 481, 483-84 (3d Cir. 2011) (citing *Donahue v. Gavin*, 280 F.3d 371, 383 (3d Cir. 2002)). Fields' reliance on *Basile v. Township of Smith*, 752 F. Supp. 2d 643 (W.D. Pa. 2010), is similarly misplaced. In that case, Magistrate Judge Lenihan recognized that some courts have carved out an exception to the common law favorable termination rule adopted in *Heck* in cases where plaintiffs can demonstrate "that their convictions (or guilty pleas) were obtained by fraud, perjury, undue influence, or some other corrupt means." *Id.* at 655. Because the plaintiffs in *Basile* alleged that the defendants had falsified the affidavit of probable cause underlying their convictions, Magistrate Judge Lenihan concluded that she could not dismiss their false arrest

claims, as a matter of law, solely because they were convicted following their arrests. *Id.* at 657. (She nonetheless went on to dismiss the complaint, without prejudice, because it did not contain enough "facts to show (or at least suggest) that the basis provided by the arresting officers' for [p]laintiffs' arrest is disputed or did not exist." *Id.* at 658.)

Here, by contrast, the parties have already engaged in discovery and Fields has not adduced any evidence that his guilty plea was procured by fraud, perjury, or any other improper means. While he claims that the affidavit of probable cause contained "material falsehoods" and that Labella "fabricated almost every factual detail set forth in his criminal complaint," he has not provided the Court with a copy of either document, nor has he identified the specific statements that are allegedly false or explained how any such statements were material to securing his guilty pleas.[6] Accordingly, because *Heck* bars Plaintiff from pursuing a claim for false arrest without first invalidating his underlying convictions, Defendant's motion will be granted as to this count.

    2.    Excessive Force[7]

In Count II, Fields alleges a claim for excessive force against all individual defendants. Defendants argue that they are entitled to summary judgment because the amount of force used

---

[6] The Court also notes that to the extent Fields' claim is actually premised on the allegedly false statements contained in the affidavit of probable cause "and events that occurred *subsequent* to his actual arrest, [it] is more properly classified as one of malicious prosecution[,]" not false arrest. *See Williams v. Scranton Police Dep't*, No. 3:14-CV-00950, 2015 WL 10567873, at *6 (M.D. Pa. Nov. 25, 2015) (emphasis in original). Such a claim would, of course, face additional hurdles that Fields likely could not overcome. *See, e.g.*, *DiBella v. Borough of Beachwood*, 407 F.3d 599, 601 (3d Cir. 2005) (emphasis added) (explaining that to make out a malicious prosecution claim, the plaintiff must have suffered "a deprivation of liberty consistent with the concept of seizure *as a consequence of a legal proceeding*").

[7] *Heck* "does not bar an excessive force claim because the claim can stand without challenging any element of the conviction." *Sharif v. Picone*, 740 F.3d 263, 269 (3d Cir. 2014) (citing *Nelson v. Jashurek*, 109 F.3d 142, 145-46 (3d Cir. 1997)).

was reasonable. They also contend that they are entitled to qualified immunity.

"Qualified immunity is intended to shield government officials performing discretionary functions, including police officers, 'from liability from civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Kopec v. Tate*, 361 F.3d 772, 776 (3d Cir. 2004) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). To determine whether a defendant is entitled to qualified immunity, the court must consider two questions: first, "whether the alleged facts, taken in the light most favorable to the injured party, 'show [that] the [government official]'s conduct violated a constitutional right'; second, . . . whether the right was clearly established 'in light of the specific context of the case, [and] not as a broad general proposition.'" *Zaloga v. Borough of Moosic*, 841 F.3d 170 (3d Cir. 2016) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). Courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

Plaintiff alleges two separate instances of excessive force: first, the alleged slap, which knocked his cell phone out of his hand; and second, the forceful handcuffing and use of the Taser. The Court will address each of these instances in turn to determine whether defendants are entitled to qualified immunity.

a. <u>Alleged Slap</u>

Defendants argue that, even assuming that the slap took place as Fields testified (which they dispute), it was a reasonable "response to Plaintiff's defensive resistance and active aggression by placing a cell phone in his face and coming into Defendant Labella's red zone." Defs.' Br. at 11. Plaintiff counters that Labella's use of force was not reasonable because Labella

12

"initiated this conflict." Pl.'s Br. at 10.

While the parties appear to assume that this claim should be analyzed under the Fourth Amendment, the Court cannot agree. "In addressing an excessive force claim brought under § 1983, analysis begins by identifying the specific constitutional right allegedly infringed by the challenged application of force." *Graham v. Connor*, 490 U.S. 386, 394 (1989). "To prevail on a Fourth Amendment excessive-force claim, a plaintiff must show that *a seizure occurred* and that it was unreasonable under the circumstances." *Lamont v. New Jersey*, 637 F.3d 177, 182–83 (3d Cir. 2011) (emphasis added). "[P]olice can be said to have seized an individual 'only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.'" *Michigan v. Chesternut*, 486 U.S. 567, 573 (1988) (citing *United States v. Mendenhall*, 446 U.S. 544, 554 (1980) (Stewart, J., concurring)). "Fleeting physical contact – even tortious contact – by a police officer that does not meaningfully limit a plaintiff's movement is not a seizure under the Fourth Amendment." *Craddock v. Borough*, No. CIV.A. 12-4519, 2015 WL 1854685, at *5 (E.D. Pa. Apr. 22, 2015) (citing *Gottlieb v. Laurel Highlands School Dist.*, 272 F.3d 168, 172 (3d Cir. 2001); *Ashton v. City of Uniontown*, 459 F. App'x 185, 189–90 (3d Cir. 2012); *Smith v. Dep't of General Servs., Pa. Capitol Police Bureau*, No. 04–cv–0997, 2005 WL 1563505 (M.D. Pa. July 1, 2005), *aff'd*, 181 F. App'x 327 (3d Cir. 2006); *Coleman v. Cerski*, No. 04–cv–1423 2007 WL 2908266 at *7 (M.D. Pa. October 4, 2007)). In *Ashton*, for example, the Third Circuit Court of Appeals found that the plaintiff was not seized when he was struck in the back of the head with a closed fist "because his movement was not occluded." 459 F. App'x at 189. Likewise, in *Smith*, the Court of Appeals held "that the solitary act of momentarily grabbing [the plaintiff's] elbow was not a seizure for Fourth Amendment purposes." 181 F. App'x at 330.

13

Here, as Fields admits, the alleged slap took place *before* Labella "attempt[ed] to effect any arrest[.]" Pl.'s Br. at 10. After he was slapped and briefly grabbed by the collar, Fields still had the ability to – and in fact actually did – voluntarily walk away from the encounter. He only remained in the vicinity of the officers to attempt to explain to Reilly what had allegedly happened to him. Thus, because he was not "seized" at the time, Fields cannot maintain a claim under the Fourth Amendment based on the alleged slap.

Fields may, however, still raise this claim under the substantive component of the due process clause. *See Ashton*, 459 F. App'x at 189 (citing *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998)) ("If a plaintiff cannot establish a Fourth Amendment seizure, a substantive due process analysis is applied to the same factual averments."). "A substantive due process violation based on excessive force occurs when an officer's conduct shocks the conscience." *Craddock*, 2015 WL 1854685, at *6 (citing *Gottlieb*, 272 F.3d at 172). To rise to that level, the conduct must be especially egregious – i.e., "'brutal,' 'offensive,' and 'intended to injure.'" *Id.* (citing *Cnty. of Sacramento*, 523 U.S. at 833; *Chainey v. Street*, 523 F.3d 200, 219 (3d Cir. 2008)). The court must consider

> whether the force applied caused injuries so severe, was so disproportionate to the need presented, and was so inspired by malice or sadism rather than a merely careless or unwise excess of zeal that it amounted to a brutal and inhumane abuse of official power literally shocking to the conscience.

*Kurilla v. Callahan*, 68 F.Supp.2d 556, 564 (M.D. Pa.1999) (internal quotations omitted). By contrast, "[c]ourts in this Circuit and others have been reluctant to find that a fleeting incident of assault can be 'conscience shocking.'" *Craddock*, 2015 WL 1854685, at *6 (citing *Ashton*, 459 F. App'x at 190; *Lillard v. Shelby Cnty. Bd. Of Educ.*, 76 F.3d 716, 725-26 (6th Cir. 1996)).

Judged against this standard, Labella's alleged conduct cannot amount to a Fourteenth Amendment violation. As Fields himself conceded, the conduct was fleeting: "It was a slap, grab

up, and then [Labella] let [Fields] go." Pl.'s Dep. at 215:9-10. Moreover, Fields did not suffer any injury. Nor is there any evidence that the slap was intended to injure Fields. Even resolving all factual disputes in Fields' favor, no reasonable jury could find that a single slap across the face and the quick grab that followed – even if unprovoked and without any legitimate purpose – shocked the conscience. *See Lillard*, 76 F. 3d at 725-26 (concluding that "[i]t is simply inconceivable that a single slap could shock the conscience.").

Because the slap did not amount to a violation of either Fields' Fourth or Fourteenth Amendment rights, the Court need not consider whether the right at issue was clearly established. Thus, summary judgment will be entered in favor of defendants on this issue.

### b. Handcuffing and Use of Taser

Defendants contend that because Fields had displayed "active aggression" and "refused to comply with orders and submit to handcuffing," Labella's use of the Taser was reasonable. Defs.' Br. at 11. Fields counters that the evidence shows that he that the right to resist the arrest because it was unlawful and, thus, no use of force was reasonable.

Fields' argument can be quickly dispelled because, as the Court has already determined, the arrest was not unlawful. Simply put, there was probable cause to arrest Fields, and he is precluded from arguing otherwise by his guilty plea. As a result, Fields' contention that he had the right to resist arrest is misguided.

Moving on, since there is no question that Fields was seized when the Taser was deployed, the Court must determine whether the use of force was reasonable. "The test of reasonableness under the Fourth Amendment is whether under the totality of the circumstances, 'the officers' actions are "objectively reasonable" in light of the facts and circumstances confronting them, without regard to their underlying intent or motivations.'" *Kopec*, 361 F.3d at

776 (quoting *Graham v. Connor*, 490 U.S. 386, 397 (1989)). "Factors to consider in making a determination of reasonableness include the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he actively is resisting arrest or attempting to evade arrest by flight." *Id.* at 776-77 (citing *Graham*, 490 U.S. at 396). The court "also may consider the possibility that the persons subject to the police action are violent or dangerous, the duration of the action, whether the action takes place in the context of effecting an arrest, the possibility that the suspect may be armed, and the number of persons with whom the police officers must contend at one time." *Id.* at 777 (citing *Sharrar v. Felsing*, 128 F.3d 810, 822 (3d Cir. 1997)). Whether an officer's conduct was reasonable should "'frequently remain a question for the jury'" but "'defendants can still win on summary judgment if the district court concludes, after resolving all factual disputes in favor of the plaintiff, that the officer's use of force was objectively reasonable under the circumstances.'" *Id.* (quoting *Abraham v. Raso*, 183 F.3d 279, 289-90 (3d Cir. 1999)).

On balance, the *Graham* factors lead to the conclusion that Labella's use of the Taser was objectively reasonable. The video indicates that Fields had taken an aggressive stance towards Labella, with his right hand balled in a fist at his side. From the perspective of a reasonable officer, Fields thus posed an immediate threat of harm. Making matters worse, once the officers attempted to place Fields in handcuffs, he activity resisted, raising his harms out in front of him. It was only at that point that Labella deployed his Taser in an effort to gain compliance. Viewing these circumstances, no reasonable jury could find that Labella's use of the Taser was excessive.

Assuming, *arguendo*, that Fields could make out a violation of his Fourth Amendment rights based on the use of the Taser, defendants would nonetheless be entitled to qualified immunity because the right in question – to be free from the use of a Taser after taking an

16

aggressive stance toward an officer and resisting arrest – was not clearly established. "[T]he case law related to Taser use was at the time of the events in question, and continues to be, developing and highly context-dependent." *Estep v. Mackey*, No. CV 3:11-207, 2016 WL 1273249, at *5 (W.D. Pa. Mar. 31, 2016). While some courts have found that the use of a Taser might be inappropriate in certain circumstances, none of which are present here, "many courts have held that the use of a Taser to overcome a suspect's resistance may be reasonable." *Id.* (collecting cases). "Meanwhile, no decision by the Supreme Court, this Circuit, or by a majority of other federal circuits had foreclosed the use of Taser guns when suspects resist arrest in an aggressive and combative manner." *Brown v. Cwynar*, 484 F. App'x 676, 681 (3d Cir. 2012). Against this backdrop, it cannot be said that a reasonable officer in Labella's shoes would have realized that federal law precluded the use of a Taser to effectuate Fields' arrest. Accordingly, defendants' motion for summary judgment will be granted as to Fields' excessive force claim.

        3.    <u>Conspiracy</u>

In Count III, Fields asserts a conspiracy claim against all individual defendants. However, because the Court has concluded that Fields' false arrest and excessive force claims fail, his "conspiracy claim must also fail because there is no underlying violation of his constitutional rights, which is a prerequisite for conspiracy liability." *Hamborsky v. O'Barto*, 613 F. App'x 178, 182 (3d Cir. 2015) (citing *In re Orthopedic Bone Screw Prods. Liab. Litig.*, 193 F.3d 781, 789 (3d Cir. 1999)). Therefore, the Court will grant defendants' motion for summary judgment as to this claim, as well.

    **B.**    **State Law Claims**

Because the Court will grant defendants' motion for summary judgment as to all of Fields' federal claims, the Court declines to exercise supplemental jurisdiction over his pendent

state law claims and will dismiss those claims without prejudice. 28 U.S.C. § 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if . . . the district court has dismissed all claims over which it has original jurisdiction.").

**V.  CONCLUSION**

Based on the foregoing, the Court will grant the motion for summary judgment filed by defendants. An appropriate order will follow.

s/ David Stewart Cercone  
David Stewart Cercone  
United States District Judge

cc:  Joel S. Sansone, Esq.  
     Massimo A. Terzigni, Esq.

     Matthew S. McHale, Esq.  
     Lourdes Sanchez Ridge, Esq.  
     Michael E. Kennedy, Esq.

     Bryan Campbell, Esq.  
     Allison N. Genard, Esq.

     (*Via CM/ECF Electronic Mail*)